**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| Margherita Guzzi Vincenti, Patricia Hughes, ) | |
| Emma Griffin, individually and on behalf of all ) Civil Case No.: 4:25-cv-850 | |
| others similarly situated ) | |
| ) | |
| Plaintiffs ) | |
| v. ) **COMPLAINT – CLASS ACTION** | |
| ) | |
| ) | |
| USA FENCING ASSOCIATION ) | |
| a Colorado Corporation ) | |
| ) | |
| and ) | |
| ) | |
| Donald Alperstein, Phil Andrews, Damien Lehfeldt, ) | |
| Molly Hill, Kat Holmes, Lauryn Deluca, Scott Rodgers, ) | |
| Andrea Pagnanelli, Jackie Dubrovich individually ) **JURY TRIAL DEMANDED** | |
| ) | |
| Defendants. ) | |

---

**VERIFIED CLASS ACTION COMPLAINT**

---

Plaintiffs Margherita Guzzi Vincenti, Patricia Hughes, and Emma Griffin (collectively, "Plaintiffs"), individually and on behalf of the Class defined herein of similarly situated persons ("Class Members"), allege the following against Defendant USA Fencing Association ("USFA") and individual defendants Donald Alperstein, Phil Andrews, Damien Lehfeldt, Molly Hill, Kat Holmes, Lauryn Deluca, Scott Rodgers, Andrea Pagnanelli, and Jackie Dubrovich (together the "Defendants"), based upon personal knowledge and information and belief as to all other matters:

## INTRODUCTION

1.     This class action is brought by female fencers who were discriminated against, defrauded, and otherwise harmed by Defendant USFA and the individual defendants. The harm resulted from Defendants' false advertising of events as women's sporting competitions while intentionally permitting biological men to compete in those women-only events.

2.     Defendant USFA hosted the North American Cup in Kansas City, Missouri, from January 3 to 6, 2025 (January NAC). This competition consisted of individual and team events grouped by age, sex, and weapon. The age groups included Senior Division I, Cadet (for fencers under 16-years-old), adult veteran fencers, and parafencers. For each event, there were two sex groups – men and women. For each sex and age groups, there were three weapon categories – foil, epee, and saber. This competition hosted a total of 52 individual events and 6 team events. 2350 athletes, including many Missouri athletes, registered and participated in a total of 3629 tournaments in this competition. There were 788 individual tournaments for minor athletes and 1044 individual tournaments for paralytic athletes and veteran athletes age-grouped from 40 to 80.

3.     During the January NAC, Defendant USFA, authorized by the individual Defendants, brazenly violated Title IX of the 1972 Educational Amendment by discriminating against biological women athletes and defrauded the Plaintiffs by falsely advertising women's events while at all times intending to include biological men in those women's events.

## THE PARTIES

4.     Plaintiff Margherita Guzzi Vincenti is an adult individual residing in Hartland, Wisconsin, and a member of Team USA and U.S. Olympian, who participated in the Senior Division I Women's Epee event in the January NAC.

5.     Plaintiff Patricia Hughes is an adult individual residing in Hilton Heads Island, South

Carolina, who participated in the Veteran Women's Epee event in the January NAC.

6.  Plaintiff Emma Griffin is an adult individual residing in Sugar Land, Texas, who participated in the Senior Division 1 Women's Foil event in the January NAC.

7.  Defendant USFA is a Colorado nonprofit membership organization located at 210 USA Cycling Point, Suite 120, Colorado Springs, CO 80919, that conducts substantial and continuous business in Missouri and has hosted and will continue to host national events in Kansas City, Missouri. Per its bylaws, USFA is governed by a Board of Directors ("USFA Board") who are vested with the full powers and responsibilities for the management and policies of the USFA including setting policy, ensuring compliance with applicable laws and regulations, and protecting athlete safety,

8.  Defendant Donald Alperstein is an adult individual residing in 429 S. Ogden St., Denver, CO 80209. He has held nearly every possible executive position on the USFA Board over the past 30 plus years, including president, legal counsel, and board director. On information and belief, despite Defendant Alperstein failing to garner enough membership support to be elected to the Board, the Board extended to Alperstein the title and authority of a "Special Board Member." In this capacity and from the time of Plaintiffs' alleged harm to present, Alperstein has served as legal advisor to the Board, including being the architect of Defendant USFA's illegal policy and deceptive business practices challenged here.

9.  Defendant Phil Andrews is an adult individual residing in 2667 E. Fremont Place, Centennial, Colorado 80122 and has been serving as the Chief Executive Officer of USFA since August 2022.

10.  Defendant Damien Lehfeldt is an adult individual residing in 6222 Berlee Dr. Alexandria, VA 22312-1224 and serving as the Chair on the USFA Board currently and at the time

of alleged harm to the Plaintiffs.

11.    Defendant Kat Holmes is an adult individual residing in 300 W 110th St. Apt 17F New York, NY 10026-4056 and serving as a director on the USFA Board currently and at the time of alleged harm to the Plaintiffs.

12.    Defendant Lauryn Deluca is an adult individual residing in 320004 N Marginal Dr, Apt 132, Willowick, OH 44095 and serving as an Athlete Director on the USFA Board currently and at the time of alleged harm to the Plaintiffs.

13.    Defendant Jackie Dubrovich is an adult individual residing in 19 Ridgewood Ter, Maplewood, NJ 07040-2132 and serving as an Athlete Director on the USFA Board currently and at the time of alleged harm to the Plaintiffs.

14.    Defendant Andrea Pagnanelli is an adult individual residing in 14 Conselyea St Apt 4. Brooklyn, NY 11211-2202 and serving as an Independent Director on the USFA Board currently and at the time of alleged harm to the Plaintiffs.

15.    Defendant J. Scott Rodgers is an adult individual residing in 10696 Greycliffe Dr, Littleton, CO 80126-5759 and serving as an Athlete Director on the USFA Board currently and at the time of alleged harm to the Plaintiffs.

### JURISDICTION AND VENUE

16.    This court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 20 U.S.C. § 1681, and Executive Order 14201 (2025).

17.    This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as the Parties are from different states and the amount in controversy exceeds $75,000.

18.    This court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are so closely related to the federal claims and/or

4

part of the same case or controversy.

19.    This Court has specific personal jurisdiction over Defendant USFA because it conducts substantial and continuous business in the Western District of Missouri. Defendant USFA recruits and trains members, referees, and coaches in the Western District of Missouri. It also develops, certifies, and collects dues from Missouri fencing clubs, and sanctions local and regional tournaments in Missouri while collecting related fees. Defendant USFA hosted one of its largest national tournaments—North American Cups (NACs)—in Kansas City, Missouri in January 2025. Additionally, USFA is scheduled to host its Junior Olympics in Kansas City, Missouri in January 2026.

20.    This Court has specific personal jurisdiction over individual Defendants, as all individual Defendants are current USFA directors or officers who authorized USFA to conduct substantial and continuous business in this District. The individual Defendants, by their intentional and/or reckless and/or gross negligent action, have authorized Defendant USFA to conduct fraudulent transactions and violate various state and federal laws and regulations, including without limitation, authorizing Defendant USFA to discriminate against women fencers and to falsely advertise its national tournament North American Cup (NAC) in Kansas City, Missouri in January 2025. As the result, the Plaintiffs suffered both economic and non-economic damages in Missouri.

21.    Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant conducts significant amounts of business transactions within this District and because some of the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

## FACT ALLEGATIONS

### *Educational Institution Receiving Federal Funding*

22.    USFA is the national governing body ("NGB") for the Olympic and Paralympic Sport of fencing in the United States. On information and belief, it is the only vocational training institution that provides official fencing referee and coach training programs and certification.

23.    On its applications to the Paycheck Protection Program (PPP) loan, a federal funded program that provides financial relief to small business during the COVID pandemic, USFA listed itself as an educational service organization twice in 2020 and 2021.

24.    USFA received two forgivable loans from the federal PPP program in the amount of $191,873 on April 11, 2020, and $266,559 on March 3, 2021.

25.    Defendant USFA is a member organization of the United States Olympic & Paralympic Committee (USOPC) and designated by USOPC as the NGB for the sport of fencing.

26.    USOPC receives direct federal funding, including taxpayer-derived appropriations, PPP forgivable loans, and funding from Department of Veterans Affairs (VA) to administer its Paralympic Military Program (PMP)—a federally funded program to support adaptive sports opportunities for wounded, ill, and injured U.S. service members and veterans.

27.    The Paralympic Military Program includes Paralympic disciplines such as wheelchair fencing and provides financial and logistical support that extends to affiliated national governing bodies involved in these activities, including USFA.

28.    According to the DOD's published budget, the USOPC was allocated approximately $2.4 million in FY 2024 and $2.5 million in FY 2025 under the Support for International Sporting Competitions (SISC) program to administer this initiative.

29. Given that the USOPC receives direct federal funding for its operations—including through the DOD, VA Department, and PPP—any funds transferred to Defendant USFA came from a commingled and indivisible pool of funds that include federal funds.

30. As a result, federal financial support flows from the federal government to USOPC and, in turn, to Defendant USFA. The USOPC's official audited financial report for the year ending December 31, 2023, confirms that USA Fencing received $1,190,129 in direct financial support from USOPC. This amount includes $784,889 in athlete grants, $214,316 in athlete services, $150,000 in NGB grants, and $40,924 in NGB services.

31. According to a 2025 USFA financial report, USFA received at least $1.239 million under the category "USOC Funding" from the USOPC.

32. On information and belief, Defendant Alperstein, as the then president of USFA at the time of the PPP loan, was personally involved in the preparation and approval of USFA's PPP loan application and had personal knowledge of USFA's status as an educational institution that had received federal funding.

33. Defendant Damien Lehfeldt is a coach and referee with personal knowledge that USFA is an educational institution that provides vocational training and certification to coaches and referees. Defendant Lehfeldt is the current chairman of USFA's board. As such, he has personal knowledge that USFA received federal funding.

34. All other individual Defendants are either coaches, referees, athletes and/or USFA executives or directors of the USFA Board. All of them have personal knowledge that USFA has always been an educational institution, and all of them have actual knowledge that USFA receives federal funding.

35. On May 7, 2025, the Subcommittee on Delivering on Government Efficiency

7

(DOGE) of the U.S. Congress subpoenaed Defendant Lehfeldt to testify in a Congressional Hearing on biological men competing in women's sports. At this hearing, Defendant Lehfeldt stated that Defendant USFA did not need to comply with President Donald Trump's Executive Order 14201 on February 5, 2025, titled *"Keeping Men Out of Women's Sports,"* which mandates that all recipients of federal financial assistance—including educational institutions and affiliated organizations—must prohibit biological males from participating in female-designated athletic competitions.

36.    Defendant Lehfeldt misrepresented material facts to the Congress by stating that USFA was a "purely private organization," and "never received any federal funding," despite having personal knowledge that USFA did receive federal funding.

37.    Defendant Alperstein, with personal knowledge of USFA's receipt of federal funding as an educational institution and while acting as the board's legal advisor, endorsed and supported Defendant Lehfeldt's misrepresentation to Congress.

38.    Similarly, Defendants Phil Andrews, Kat Holmes, Molly Hill, Andrea Pagnanelli, Lauryn Deluca, Scott Rodgers, and Jackie Dubrovich adopted and endorsed Defendant Lehfeldt's misrepresentations to Congress despite knowing USFA is an educational institution which receives federal funding both directly and through USOPC.

### *Blanket Approval of Biological Men Competing in Women's Events*

39.    As approved and implemented by the individual Defendants, and continuing until August 1, 2025, Defendant USFA maintained a near-blanket policy permitting athletes under age 16 (Cadet and younger divisions) to compete in women's fencing events regardless of their sex assigned at birth. This policy expressly provided that "transgender and non-binary athletes competing in youth events are permitted to compete in the gender category with which they

identify, without restriction."[1]  Under this rule, a youth or cadet fencer could compete in one gender category during a season and switch to another in a later season, subject only to parental approval.

40.  Although the January 2025 North American Cup ("NAC") in Kansas City was designated for Cadet and Senior fencers, the eligibility structure allowed many athletes younger than 16 to compete in both divisions by virtue of their accumulated national points. For example, Plaintiffs include minors as young as 13 who were qualified and did in fact compete in both Cadet and Senior Division I events. Because Defendant USFA's youth and cadet policy authorized self-identification "without restriction" and lacked any verification mechanism, biological males under 16 were permitted, and could have been expected, to compete in the women's events held at the January 2025 NAC.

41.  For cadet athletes who qualified to compete in junior or senior events, Defendant USFA's policy required compliance with the rules applicable to those older divisions. Under that policy, "transgender female (MTF) athletes … may only compete in women's events after completing one calendar year (12 months) of testosterone-suppression treatment," and "proof of compliant hormone therapy must be provided prior to competition."[2] On information and belief, Defendant USFA never implemented any system to monitor or verify compliance with this requirement. In practice, this lack of oversight allowed biological males to register for and compete in women's events regardless of whether they had completed any hormone-suppression treatment.

42.  Defendant USFA also does not disclose to members or participants whether transgender or non-binary athletes are entered in a given event, leaving female athletes and parents

---

[1] USA Fencing, *Proposed Transgender & Non-Binary Policy Draft* (2023) ("proposed policy circulated publicly and used as operative guidance for USA Fencing competitions during 2023-25"), available at https://static1.squarespace.com/static/5a7a23d94c326db2424964a8/t/645c39f0844c501ffc08f791/1683765745268/USA+Fencing+Proposed+Transgender+Policy+Draft.pdf.
[2] *Id*. at 3.

unable to make informed participation decisions. The finalized version of the Transgender & Non-Binary Athlete Eligibility Policy—effective August 1, 2025—confirms that future competitions will be governed by substantially similar provisions.[3]

43.　Because of these policies and the lack of enforcement mechanisms, biological males of all ages—including those under 16 as well as adult transgender athletes—were permitted to compete in women's events. This systemic failure to verify hormone-suppression compliance or to segregate competition by biological sex created a deceptive impression of sex-segregated competition while, in reality, abolishing it.

44.　Despite these material facts, Defendant USFA only advertises its tournaments using two categorical designations—"Men's" and "Women's" events—without any disclosure that the "Women's" category includes athletes assigned the sex of male at birth. This practice has created a false and misleading impression that all USFA-sanctioned events are divided strictly by biological sex.

45.　USFA's failure to disclose the inclusion of athletes assigned male at birth in women's events caused numerous adult fencers, minor fencers, and parents of minor fencers to register and pay fees under the reasonable belief that the competitions were restricted to biological females. Participants relied on these representations to their detriment and incurred costs associated with registration, travel, lodging, and participation in what they believed were sex-segregated events.

### False Advertisement

46.　Defendant USFA advertised the January NAC to be sex segregated competitions, as it claimed in all other tournaments hosted by USFA.

47.　Relying on Defendant USFA's advertisement, Plaintiffs paid registration fees,

---

[3] *USA Fencing, Transgender & Non-Binary Athlete Eligibility Policy* (2025), available at https://www.usafencing.org/transgender-and-nonbinary-policy.

tournament fees, incurred travel and hotel expenses, and many had to take days off from work to attend this falsely advertised competition.

48.    Plaintiffs reasonably trusted Defendant USFA's advertisement because Defendant USFA is an NGB sanctioned by the USOPC. It was reasonable for Plaintiffs to believe that (a) an NGB would not falsely advertise events and (b) that children would compete with other children of the same sex assigned at birth.

## CLASS ACTION ALLEGATIONS

49.    All previous paragraphs are incorporated herein.

50.    Plaintiffs seek to represent a class defined as all persons in the United States who registered for, participated in, or had a minor child participate in, the January NAC which was organized, sanctioned, and hosted by the Defendants.

51.    Class members are so numerous that their individual joinders herein are impracticable. On information and belief, the Class members will be thousands. The precise number of Class members and their identities are unknown to Plaintiffs at the time of this filing but may be determined through discovery. Class members may be notified of the pendency of this action after May 7, 2025, when Defendant Lehfeldt falsely testified before the Congress in his capacity as Defendant USFA's Chair that Defendant USFA was not an educational institution and had never received federal funding and thus was not subject to Title IX and the February 5, 2025, Executive Order 14201, titled "Keeping Men Out of Women's Sports." This testimony triggered public scrutiny and investigation, which revealed Defendant USFA's series of deceptive actions and illegal conduct allowing biological men to compete in its advertised women's events.

52.    Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include

but are not limited to

  (i)  Whether Defendant USFA's policy of allowing transgender-identifying biological males to compete in women's categories violated Title IX's prohibition on sex discrimination in federally funded educational programs;

  (ii)  Whether Defendant USFA falsely advertised its fencing events as sex-segregated when, in fact, it allowed biological males to compete in women's events;

  (iii)  Whether Defendant USFA violated its nonprofit status by engaging in deceptive and fraudulent advertising inconsistent with its stated purpose;

  (iv)  Whether Defendant USFA has invalidated its nonprofit status by violating state and federal laws, including by way of its sex discrimination in violation of Title IX;

  (v)  Whether Defendant Lehfeldt's false Congressional testimony made under oath violated 18 U.S.C. §1001;

  (vi)  Whether individual Defendants have conspired to violate Title IX and engage in deceptive and/or fraudulent advertisement;

  (vii)  Whether individual Defendants' intentional, reckless, and/or grossly negligent action or inaction by approving Defendant USFA's illegal activities should result in their personal liability to the Plaintiffs and Class members; and

  (viii)  Whether Class members suffered economic and noneconomic harm because of the Defendants' illegal conduct and omissions.

53. The named Plaintiffs' claims are typical of Class claims in that the Defendant's

conduct toward the putative class is the same: Defendant USFA's conduct has caused Plaintiffs and their families significant emotional distress, financial loss, and a loss of trust in Defendant USFA's integrity:

> (i) Defendant USFA's policy allowing transgender-identifying biological males to compete in women's categories violates Title IX, which prohibits sex discrimination in any federally funded educational program, including athletic programs;

> (ii) Defendant USFA falsely advertised its fencing events as sex-segregated, while knowingly allowing biological males to compete against females, including minors;

> (iii) Defendant USFA also violated its nonprofit obligations under IRC § 501(c)(3) by engaging in activities - including sex discrimination and fraudulent advertisement - that deviated from its stated educational mission and violated federal law.

54. Plaintiffs are adequate representatives of the Class, have no conflicts of interest, and have retained experienced litigation counsel. The three lead attorneys (Mr. Bacon, Mr. Wang, and Ms. Sweigart) have over 90 years combined litigation experience, including complex litigation matters. They are committed to prosecuting this action vigorously and will fairly and adequately protect the interests of all Class members.

55. The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and

expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLASS ACTION CAUSES OF ACTION

### FIRST CLAIM OF RELIEF
### VIOLATION OF TITLE IX (Against Defendant USFA)

**(20 U.S.C. § 1681, et seq; Executive Order 14201 (2025);**
**Mo. Rev. Stat. §§ 191.1720 & 163.048;**
*R.M.A. v. Blue Springs R-IV Sch. Dist.*, **No. SC100694, 2025 LX 106135 (June 10, 2025))**

56.　All previous paragraphs are incorporated herein.

57.　Defendant USA Fencing Association ("USFA") is the National Governing Body ("NGB") for the Olympic and Paralympic Sport of fencing in the United States. It is the only recognized vocational training institution providing official fencing referee and coach training programs and certifications nationwide.

58.　As a direct and proximate result of Defendant USFA's receipt of federal funds and its sex-discriminatory policies described above, Plaintiffs and Plaintiffs' minor children were denied equal access to athletic opportunities, suffered measurable economic damages, and are entitled to injunctive and monetary relief under 20 U.S.C. § 1681.

59.　Pursuant to Title IX of the Education Amendments of 1972 (Title IX), codified at 20 U.S.C. § 1681(a), no person shall, based on sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving

federal financial assistance, including athletic activities. See 20 U.S.C. § 1681(a).

60.    Defendant USFA is subject to Title IX because it is an educational institution that has received federal funding both directly and indirectly. USFA qualifies as an "educational institution" under 20 U.S.C. § 1681(c) because it operates structured, national vocational training and certification programs for fencing coaches, referees, and athletes. These programs are fee-based, credentialed, and designed to advance participants in a professional capacity within the sport. In its federal loan application, Defendant USFA listed itself as a nonprofit organization in the educational industry. Defendant USFA claimed itself as an educational institution under Internal Revenue Code 501(C)(3) to benefit from the federal tax exemption for nonprofit organizations.

61.    Defendant USFA has received substantial federal financial assistance both directly and through USOPC. It applied and obtained two separate forgivable loans from Paycheck Protection Program (PPP) in the amount of $190,417 on April 11, 2020, and $264,667 on March 3, 2021, respectively. Both loans were entirely forgiven, evidencing full satisfaction of federal program requirements and confirming Defendant USFA's receipt of direct taxpayer funding.

62.    Defendant USFA has received indirect federal support through the United States Olympic & Paralympic Committee (USOPC), which itself receives annual federal appropriations to fund Olympic and Paralympic programs, including funding from Department of Defense and Department of Veteran Affairs for the Paralympic Military Program (PMP). USOPC received $2.4 million in FY 2024 and $2.5 million in FY 2025 under the federally funded Support for International Sporting Competitions (SISC) program.

63.    Defendant USFA's financial disclosures confirm that it received $784,869 in grants from USOPC in 2023 and $1,239,102 in 2024. The USOPC's own audited statements further verify

that Defendant USFA received $1,190,129 in 2023 in the form of athlete grants, athlete services, and NGB support. Because there is no indication that federal and non-federal funds are segregated at any stage, the entire fund pool becomes commingled and indivisible, and the financial support Defendant USFA receives is presumptively federal in nature.

64.    Despite being subject to Title IX, Defendant USFA has adopted and maintained a "Transgender and Non-Binary Athlete Eligibility Policy" that permits school age athletes to freely select their gender identity for purposes of competition, without regard to biological sex, medical history, legal documentation, or any objective verification. For school aged athletes under 16 years old, this policy is entirely self-determined and unregulated.

65.    Subsection A of Section 14.4 of the Defendant USFA Athlete Handbook, in force from 2022 until August 1, 2025, explicitly allows athletes—including minors in youth divisions such as Y10, Y12, Y14, and Cadet (Y16)—to compete in categories that align with their self-declared gender identity.

66.    There is no requirement for a diagnosis, treatment, or medical transition for this age group. This provision is repeated verbatim across multiple annual editions of the Handbook, indicating deliberate and sustained enforcement.

67.    Since 2022 and up until August 1, 2025, as per its official policy, Defendant USFA has been allowing biological men above 16 years old to participate in women's events if those men have sustained one year of testosterone suppression treatment. However, as Defendant Phil Andrews, the CEO of Defendant USFA, stated in writing, that there is serious deficiency in the enforcement of this requirement. Defendants do not publish whether and how this requirement is enforced and severely penalize anyone who dares to question whether a biological male fencer is qualified for a women's event.

68. As a result, biological male athletes are permitted to compete in female-designated events, from youth and cadet categories involving children as young as 8 years old to veteran fencers as old as 80 years old. This creates inherent physical disparities, increases safety risks, and deprives female athletes of fair competition and equal opportunity—all of which Title IX was enacted to prevent.

69. Title IX mandates that no person, based on sex, shall be excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal funds. During the years in question, and continuing through August 1, 2025, Defendant USFA has enforced and maintained a policy permitting biological males—i.e., transgender-identified athletes who were born male but identify as female—to participate in competitions designated for women.

70. While Title IX prohibits any discrimination based on sex in any federally funded institution, the federal statute leaves it to the state law to define sex. Therefore, the definition of sex under Missouri state law is determinative of sex for the tournaments at issue and for the purpose of Title IX.

71. The Missouri Supreme Court firmly held in *R.M.A. v. Blue Springs R-IV Sch. Dist.*, No. SC100694, 2025 LX 106135 (June 10, 2025) that "sex" refers only to "*One's biological classification as male or female*" under Missouri Human Rights Act (MHRA) and does not extend to gender identity or sexual orientation. *Id*. at *10. It is the law of Missouri that "sex" has the plain and ordinary meaning of the word "sex," with the term consistently defined in longstanding dictionary sources as referring to biological characteristics, including reproductive anatomy and genetic composition at birth.

72. The Missouri Save Adolescents from Experimentation (SAFE) Act defines

"biological sex" based on biological factors present at birth, such as chromosomes, hormones, gonads, and genitalia, "*without regard to an individual's psychological, chosen, or subjective experience of gender.*" See Mo. Rev. Stat. § 191.1720.

73.   Missouri's Save Women's Sports Act (See Mo. Rev. Stat. § 163.048), which also defines sex based on reproductive biology and genome at birth, prohibits transgender athletes from competing in interschool tournaments that do not align with their biological sex. More than half of the participants in the January NAC are of school age. The same protection of SAFE should be extended to athletes in the January NAC.

74.   When Defendant USFA comes to Missouri to conduct business, benefiting from the protection of Missouri law and generating revenue from the State of Missouri, it is required to observe and abide by Missouri law irrespective of Defendant USFA's own policy and individual Defendants' personal ideological belief.

75.   By placing its Transgender and Non-Binary Athlete Eligibility Policy above Missouri statute and binding case law, Defendant USFA violated both Title IX and Missouri law. All individual Defendants are also liable for willfully authorizing USFA to commit such violations and recklessly disregard both Federal and Missouri statutory mandates. By allowing gender identity to override biological sex in determining athletic participation, Defendant USFA has instituted a discriminatory system that deprives women of the right to compete in a competition of their own sex category and results in the exclusion and unequal treatment of biologically female athletes in direct violation of federal and Missouri state law.

76.   Defendant USFA has knowingly applied this policy at the January NAC, one of its largest and highest national-level events held in Kansas City, Missouri, a jurisdiction that, by statute and court precedent, recognizes only binary sex classification at birth. By doing so,

Defendant USFA has amplified the discriminatory impact on biological female athletes and shown open defiance of both federal and state mandates.

77. As a direct or proximate result of Defendant USFA's policy and conduct, biological female athletes have been deprived of equal access to competitive opportunities, recognition, and advancement. Defendant USFA's policy discriminates against women, lacks any important governmental interest, and is not substantially related to a legitimate objective. It violates both Title IX and the laws of the State of Missouri, causing ongoing harm to female athletes and their families.

**SECOND CLAIM OF RELIEF**
**FALSE ADVERTISEMENT/VIOLATION OF MISSOURI MERCHANDISING**
**PRACTICES ACT (Against Defendant USFA)**

78. All previous paragraphs are incorporated herein.

79. Missouri legally recognizes only two sexes: male and female at birth. Therefore, the authoritative document evidencing a person's sex is a state-issued birth certificate based on biological factors present at birth, such as chromosomes, hormones, gonads, and genitalia, "without regard to an individual's psychological, chosen, or subjective experience of gender." The State Supreme Court in *R.M.A. v. Blue Springs R-IV Sch. Dist.*, No. SC100694, 2025 LX 106135 (June 10, 2025) held that "sex" refers only to "[o]ne's biological classification as male or female" and does not extend to gender identity or sexual orientation. It is the law of Missouri that "sex" has the plain and ordinary meaning of the word "sex," with the term consistently defined in longstanding dictionary sources as referring to biological characteristics, including reproductive anatomy and genetic composition at birth.

80. Therefore, when Defendant advertises a women's event, under Missouri law, only women by birth—that is, individuals whose biological characteristics at birth were female, as

ordinarily reflected on their original birth certificates—should be allowed to participate in that event.

81.    Defendant USFA's false advertisement violated Missouri Merchandising Practices Act (MMPA) and other related statues that prohibit businesses from making false or misleading statements in advertisements that promote the sale or consumption of services. See Mo. Rev. Stat. § 407.010 et seq.

82.    The tournament entry, membership, and certification services purchased by Plaintiffs constitute "merchandise" within the meaning of Mo. Rev. Stat. § 407.010 because they are services offered or sold to consumers for personal, family, or household purposes.

83.    Plaintiffs and all similarly situated individuals meet the requirements of MMPA as:

    (i)    Defendant USFA solicited Plaintiffs via national advertising and direct email. Plaintiffs purchased the services offered by Defendant USFA's deceptive and misleading advertisement and paid the Defendant USFA tournament registration and competition participation fees.

    (ii)    Defendant USFA's advertisement was solely targeted for individual fencers, not for business-to-business purposes;

    (iii)    Defendant USFA's advertisement unlawfully misrepresented that the competitions were offered in a sex-segregated manner with separate men's and women's events, while always intending to allow biological men into women's events in violation of multiple federal and state laws; and

    (iv)    The Plaintiffs and all similarly situated individuals suffered actual financial losses because of Defendant USFA's false advertising.

84.    In connection with the advertisement and sale of this merchandise, Defendants

represented that certain tournaments and events were "women-only" competitions while knowing and intending that biological males would be permitted to participate. These statements were false, misleading, and deceptive practices under Mo. Rev. Stat. § 407.020.

85. Defendant USFA engaged in trade and commerce by organizing and promoting national-level fencing tournaments, and offering these services to the public, including Missouri residents and interstate participants. MMPA specifically defines "trade" or "commerce" to include the "advertising, offering for sale, sale, or distribution, or any combination thereof of *any services*." See Mo. Rev. Stat. § 407.010(7) (emphasis added). Therefore, MMPA applies to Defendant USFA.

86. Defendant misrepresented the characteristics of service offered by advertising the January NACs as consisting of sex-separated "Men's" and "Women's" divisions; publishing this information on its official website, registration portals, schedules, and promotional materials; and soliciting Plaintiffs and other similarly situated individuals via direct email marketing. See Mo. Rev. Stat. § 407.010(1).

87. Defendant USFA's advertisements and public communications included detailed breakdowns of events by gender, age category (e.g., Cadet, Senior, veterans by age groups), and weapon (foil, épée, saber), reinforcing the impression that female competitors would participate only in events restricted to other biological females.

88. This presentation conveyed that the "Women's" divisions were restricted by biological sex—an essential characteristic for fencers and parents of young athletes to select which events to enter and invest in—as women means biological women at birth in Missouri. As any reasonable person would understand the word "women" to refer to the biological sex assigned at birth, the Plaintiffs had no reason to doubt that the word "women" used in Defendant USFA's advertisement would exclude biological men. Further, Plaintiffs had no reason to question that

Defendant USFA, a NGB, would place its ideological policy above the hosting state's law.

89. Contrary to its advertising, Defendant USFA had adopted and was enforcing a policy allowing biological males self-identifying as female to participate in "Women's" divisions, including youth and cadet-level events, without any restriction or proof of medical treatment.

90. Although Defendant USFA's official policy requires a one-year testosterone suppression treatment before biological males identifying as female may fence in women's events above cadet group, it never disclosed how this policy was enforced and CEO Defendant Phil Andrews admitted that there is a serious deficiency in the enforcement of this requirement.

91. Defendant USFA knew or should have known that its transgender policy would attract biological males identifying as females to join women's events. However, Defendant never disclosed this eligibility policy in any promotional or registration material and failed to disclose or clarify in its advertisement that "Women's" divisions were open to biological males. Thus, Defendant materially misrepresented a core characteristic of the service offered.

92. Defendant USFA misrepresented the standard or quality by marketing a false impression that the January NAC would conform to laws of the hosting state and to the generally understood definition of men and women so that women's events would be biologically female-only competitions. Defendant USFA intentionally omitted any mention in its marketing materials of its deviation from the hosting state law and the generally understood and accepted meaning of sex.

93. Defendant USFA misrepresented and failed to inform athletes in the "Women's" divisions of its policies allowing biological men to participate in "Women's" events, and this intentional omission of material facts directly impacted the Plaintiffs' willingness to participate.

94. Defendant USFA promoted "Women's" events in public-facing materials, intending

to attract registration and commercial engagement from athletes seeking biologically female-only competition.

95. At the time of advertising, Defendant USFA did not intend to restrict participation in the "Women's" division to biological females. It instead applied a different eligibility policy that allowed any sex to participate in its marketed "women's events," contrary to its public representation.

96. Allowing biological man to participate in the woman's event was not disclosed and was inconsistent with the stated nature of the competition. Because the Plaintiffs do not have access to Defendant USFA's database of registered transgender fencers, the actual number of biological men in women's events can only be determined through discovery.

97. Therefore, Defendant USFA's advertising was false and deceptive and made with intent to sell a product or service under materially different terms than those represented, in violation of MMPA.

98. Defendant USFA was aware when it advertised and registered participants that its policy allowed transgender-identifying biological males to register and compete in the "Women's" division.

99. Defendant USFA intentionally failed to disclose this material fact, which would have affected a reasonable consumer's decision to participate or compete in the advertised "women's events" against biological men.

100. Plaintiffs and their families were induced to register for and attend the events based on this deceptive misstatement or material omission. Had Defendant USFA disclosed its eligibility policy, Plaintiffs would not have incurred the costs of participation.

101. The omission of Defendant's eligibility policy constituted a material concealment

intended to induce purchase and payment, which Plaintiffs made to the Defendant USFA.

102. Defendant USFA's acts and omissions were a producing cause of economic damages to Plaintiffs by paying registration fees, booking travel and lodging, and purchasing equipment and services based on materially false and deceptive representations.

103. As a direct and proximate result of Defendant USFA's false advertising, Plaintiffs have suffered damages ranging from one to several thousand dollars per fencer and are entitled to relief under MMPA, including but not limited to monetary damages, attorneys' fees, and other remedies as the Court deems appropriate.

**THIRD CLAIM OF RELIEF**
**BREACH OF CONTRACT (Against Defendant USFA)**

104. All previous paragraphs are incorporated herein.

105. All Plaintiffs and other participants are members of Defendant USFA. USFA's Bylaws and its status as a single purpose nonprofit organization dedicated to the promotion of fencing sport are the most important consideration for the Plaintiffs and their minor children to join the organization. To observe the Bylaws and maintain its nonprofit status under Internal Revenue Code Section 501(c)(3) are part of Defendant USFA's important contractual obligations.

106. Defendant USFA is a nonprofit organization under the Internal Revenue Code §501(c)(3), 26 U.S.C. § 501(c)(3), with a registered purpose of promoting fencing and providing athletic opportunities for youth, including female and male amateur athletes.

107. Defendant USFA must be organized and operated exclusively for the stated exempt purposes such as charitable, educational, or amateur athletic activities. It must not operate for the benefit of private interests, advocate political interests apart from its mission, or engage in substantial non-exempt activity. It also may it use its status to facilitate the commission of unlawful acts.

108. Defendant USFA has materially deviated from its stated exempt purpose:

> (i) By advancing ideologically driven policies that permit biological males to participate in competitions explicitly advertised and designated as "Women's" events; and

> (ii) By engaging in gender-discriminatory practices under the guise of inclusion, effectively undermining the integrity of women's fencing and diminishing competitive opportunities for biologically female athletes.

109. These actions are inconsistent with Defendant's stated mission and represent a gross departure from its exempt purposes. The misrepresentation of event characteristics for financial gain are not charitable or educational in nature and are prohibited under applicable federal tax regulations.

110. Pursuant to IRC § 4958, Defendant's engagement in unlawful conduct or use of its tax-exempt platform to violate federal laws—including Title IX—risks sanctions and penalties, including revocation of tax-exempt status.

111. Defendant USFA's promotion of ideologically driven practices at the expense of its fencing mission, its misleading event advertisements, and its discrimination against biological women violate the conditions of its federal nonprofit status.

112. Plaintiffs and their minor children joined USFA in reliance on its status as a national fencing association that promotes fencing, complies with applicable federal and state laws, and maintains its 501(c)(3) nonprofit status. Defendants breached their contracts with Plaintiffs by violating those laws, as alleged above.

113. As a direct and proximate cause of Defendant USFA's breach of contract with its members by willful misrepresentations, fraudulent advertisement, negligence, and

mismanagement, Plaintiffs have suffered both economic and non-economic losses.

**FOURTH CLAIM OF RELIEF**
**CONSPIRACY**
**(Against Defendant USFA and Defendants Donald Alperstein, Phil Andrews, Damien Lehfeldt, Molly Hill, Kat Holmes, Lauryn Deluca, Scott Rodgers, Andrea Pagnanelli, and Jackie Dubrovich)**

114.  All previous paragraphs are incorporated herein.

115.  Individual Defendants Alperstein, Lehfeldt, Andrews, Hill, Holmes, Deluca, Rodgers, Pagnanelli and Dubrovich conspired to place their personal ideological interests over USAF's interests by establishing Defendant USFA's nonbinary and transgender policy allowing biological men into women's events in the guise of inclusivity while deceptively labeling USFA competitions as men's and women's events to maximize profit (the "Scheme"), all at the expenses of safety, fairness, and equality of women fencers.

116.  At all times material hereto, the Defendants' agreement to enter into and implement the Scheme were ultra vires, in violation of federal and state law, and in violation of the bylaws of USFA. By way of example, Defendants' agreement to the following were all ultra vires: 1) discriminating against women assigned female at birth by forcing them to compete against competitors assigned the sex male at birth; 2) falsely advertising that certain events were "Women's events" while omitting the material fact that biological males were permitted to participate; and 3) violating Executive Order 14201 by organizing competitions in which competitors assigned the sex male at birth compete against competitors assigned the sex female at birth while receiving federal funding.

117.  Individual Defendants further conspired to rigorously enforce the nonbinary and transgender policy that violate Title IX. At the same time, they authorized and approved Defendant USFA to falsely advertise its January NAC as being sex segregated into women's and men's events

while intending to and actually including biological men in women's events.

118. Individual Defendants conspired to conceal the fact that biological men were allowed to participate to women's events to attract women athletes to those events, in violation of the Missouri MMPA.

119. As a result of the Defendants' conspiracy, Plaintiffs and similarly situated individuals suffered both economic and noneconomic damage.

120. As members of a conspiracy, each individual Defendants is the agent of the other bound by the actions of the other individual Defendants in furtherance of the Scheme.

**FIFTH CLAIM OF RELIEF**
**NEGLIGENT MISREPRESENTATION/NEGLIGENCE PER SE**
**(plead in the alternative to Second Claim of Relief Against Defendant USFA and**
**Defendants Donald Alperstein, Phil Andrews, Damien Lehfeldt, Molly Hill, Kat Holmes,**
**Lauryn Deluca, Scott Rodgers, Andrea Pagnanelli, and Jackie Dubrovich)**

121. All previous paragraphs are incorporated herein.

122. This Count is pled in the alternative to Plaintiffs' statutory claim under the Missouri Merchandising Practices Act and their breach of contract claim. Plaintiffs allege negligent misrepresentation and negligence per se based on Defendants' breach of a statutory and common-law duty of truthful advertising, which exists independently of any contract between the parties.

123. Pursuant to Mo. Rev. Stat. § 407.020 and related statutes, Defendants owed a statutory duty to refrain from deception, fraud, false pretense, false promise, misrepresentation, or concealment, suppression, or omission of material facts in connection with the advertisement and sale of merchandise, including services offered to consumers in Missouri. This statutory duty exists independent of any contractual relationship with Plaintiffs.

124. While advertising and promoting their tournaments and services, including the January 2025 North American Cup in Kansas City, Missouri, Defendants supplied information in

the course of their business about the nature, eligibility criteria, and competitive characteristics of "Women's" events.

125.  Because of Defendants' failure to exercise reasonable care, this information was false and misleading. Defendants represented that the tournaments and events were "women-only" competitions restricted by biological sex, but in fact allowed biological males identifying as female to compete in these divisions and failed to disclose their actual eligibility policies.

126.  Defendants' advertising and marketing materials were intentionally provided to a limited group of persons—including Plaintiffs, parents of minor athletes, and fencing clubs—for the guidance of those persons in making specific business transactions, namely, registering and paying for tournament entry, memberships, certifications, travel, and related services.

127.  Plaintiffs and similarly situated consumers justifiably relied on Defendants' representations and omissions in registering for the tournaments, purchasing event services, paying entry fees, and incurring travel and lodging expenses. Had Defendants disclosed the true eligibility policy, Plaintiffs would not have purchased or participated in these events.

128.  Defendants' breach of their statutory duty and their negligent misrepresentations were the direct and proximate cause of Plaintiffs' pecuniary losses, including but not limited to entry fees, travel and lodging expenses, lost advancement and recognition opportunities, and other economic and non-economic damages.

129.  Under Missouri law, violation of a statute designed to protect a particular class of persons (such as Mo. Rev. Stat. § 407.020 and related statutes) constitutes negligence per se. Plaintiffs are within the class of persons the statute was designed to protect, and the harm they suffered, paying for services materially different from those advertised, is the type of harm the statute was intended to prevent.

130.  As a direct and proximate result of Defendants' negligent misrepresentations and omissions, and Defendants' negligence per se in violating their statutory duty, Plaintiffs suffered damages ranging from one to several thousand dollars per fencer and continue to face ongoing harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant USFA as follows:

a.  Award Plaintiffs and the proposed class members actual damages for all tournament fees paid to Defendant USFA and all direct damages resulting from travel, lodging, participation costs, lost income, and other economic losses incurred in Plaintiffs' participation in the January 2025 NAC, as well as all actual damages arising from Defendants' negligent misrepresentation and negligence per se related to the January 2025 NAC, including but not limited to entry fees, travel, lodging, equipment costs, and lost competitive opportunities.

b.  Award Plaintiffs and class members punitive damages in an amount equal to the greater of five times the aggregated actual damages sustained by the class or $500,000, for Defendant USFA's willful and reckless violation of Title IX, the Missouri Merchandising Practices Act, and Defendants' negligent misrepresentation and negligence per se associated with the November NAC as alleged in Count V.

c.  Order the dissolution of Defendant USFA's current Board of Directors for its reckless disregard and gross negligence of applicable law, continuous failure in corporate governance and persistent noncompliance with nonprofit standards.

d.  Order Defendant USFA to cease all political and ideological advocacy and unrelated

business activities not authorized under the Internal Revenue Code, and to bring the organization into full compliance with all federal and state laws within 90 days, under a court-supervised transitional management team consisting of three member-elected directors, two athlete representatives, and two member representatives, pursuant to Mo. Rev. Stat. § 407.025.1(3).

e. Order a comprehensive financial and operational audit of Defendant USFA, commencing from the fiscal year beginning October 1, 2024, to present.

f. Award Plaintiffs reasonable attorneys' fees, costs, and expenses under applicable federal and state statutes, including but not limited to Mo. Rev. Stat. § 407.025.

Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against each and every individual Defendant as follows:

g. Award Plaintiffs and the class members punitive damages in the amount of $500,000 to be paid by the individual Defendants, jointly and severally, for their willfulness, recklessness, gross negligence, conspiracy, fraud, mismanagement, and negligent misrepresentation in the above violations of the law.

h. Enter an order banning Defendants Alperstein, Lehfeldt, Andrews, Hill, Holmes, Deluca, Rodgers, Pagnanelli, and Dubrovich from participating in any USFA election or assuming any official or management position within USFA for a period of five (5) years from the date of the order.

i. Award such other and further legal or equitable relief as the Court may deem just, proper, and necessary in the interests of justice.

## DEMAND FOR JURY TRIAL

Plaintiffs and Class Members demand a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: October 29, 2025           Respectfully submitted,

/s/Karin M. Sweigart
KARIN M. SWEIGART
MO Bar #75943
KSweigart@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

Charles Xiaolin Wang*
DC Bar #：470265
cwang@mbhylaw.com
**Mahdavi, Bacon, Halfhill & Young, PLLC**
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
(703) 420-7620

James T. Bacon*
VA Bar #：22146
jbacon@mbhylaw.com
**Mahdavi, Bacon, Halfhill & Young, PLLC**
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
(703) 420-7620

*pro hac vice forthcoming*

31